# AFFIDAVIT

I, Jerry W. Heyn, Jr., being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKROUND

1. I am a Senior Special Agent of the U.S. Secret Service, and have been since September 29, 1997. I have attended the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, GA and the U.S. Secret Service Special Agent Training Course in Beltsville, MD. As part of my duties, I investigate criminal violations relating to threats against the President of the United States and other protectees of the Secret Service. I have received training and instruction in this field and have had the opportunity to participate in investigations relating to it.

2. This affidavit is submitted in support of an application for a search warrant for a device, (more fully described in Attachment A), and the data located therein, there being probable cause to believe that located in the place described in Attachment A are items described in Attachment B, being evidence and instrumentalities of violations of 18 U.S.C. 871(a).

3. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are necessary to establish probable cause to believe that evidence and instrumentalities of violations of 18 U.S.C. 871(a) are located in the place described in Attachment A.

4. The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5. The item to be searched is held in evidence at the U.S. Secret Service, Denver Field Office Evidence Room in Greenwood Village, Colorado, and was seized pursuant to a written, signed consent form. It is being held in evidence under case number 127-671-00442537. The item is an LG model LG-h932 mobile telephone IMEI 358165081142241 hereinafter and in Attachments A and B the "Device."

6. Your Affiant believes there is probable cause to believe that the Device contains evidence and instrumentalities of violations of federal law, including, 18 U.S.C. 871(a). The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

7. The Device is currently in the lawful possession of the U.S. Secret Service. The Device came into the U.S. Secret Service's possession in the following way: on February 14, 2019, Timothy Ryan Cessor ("Cessor") signed a written consent to search form for his possessions at his family's home at 3545 Stampede Ranch Road, Cheyenne, Wyoming related to an investigation of threats against

the President of the United States made by Cessor.  On February 14, 2019, I met with Cessor's father, Jeff Cessor, the home owner, who admitted me to the home.  When shown the written consent to search form signed by his son, Timothy Cessor, and upon noting that the consent to search included mobile telephones and other electronic devices, Jeff Cessor gave me Cessor's mobile telephone, which Jeff Cessor had in his possession since February 4, 2019. Therefore, while your Affiant might already have all necessary authority to examine the Device, your Affiant seeks this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

8. The Device is currently in storage at 5619 DTC Parkway, suite 400, Greenwood Village, Colorado 80111.  In my training and experience, I know that the Device has been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as it was when the Device first came into the possession of the U.S. Secret Service.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

9. Based on my training and experience, your Affiant knows about the following items, hereinafter and below and in the Attachments "Device."

10. A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites.   Wireless telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an integrated circuit that securely stores the International Mobile Subscriber Identity ("IMSI") and the related key used to identify and authenticate subscribers on mobile telephone devices.  A SIM is embedded into a removable "SIM card," which can be transferred between different mobile devices.  A SIM card contains a unique serial number ("ICCID"), IMSI, security authentication and ciphering information, temporary information related to the local network, a list of the services to which the user has access, and certain passwords. Most SIM cards will also store certain usage data, such as call history, text ("SMS") messages, and phone book contacts.  Such telephones may also contain removable storage media, such as a flash card—such devices can store any digital data, and can have the capacity to store many gigabytes of data.  Wireless telephones may also be "smartphones," such that they operate as personal computers capable of accessing the Internet.  They operate as GPS navigation devices and can store information about where they have been.  They also contain digital cameras. The camera can mark a photo with location data so that upon examination it can be determined where and when a

photo was taken. These images can sometimes be recovered even if the user has deleted the image. The smartphone can also connect to the internet using wireless connections, which allow for images, files and other information to be uploaded directly to the Internet or to other digital storage devices or computers. Smartphones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and presentations. They can also operate as a "tablet," or mobile computer, and can contain software programs called applications. Those programs can perform different functions and save data associated with those functions, including use associated with the Internet. They also operate as personal digital assistants and have contacts and calendar functions. They also can contain media such as music and other files in large quantity.

11. Based on my knowledge, training, and experience, your Affiant knows that devices which operated similarly to the Device can store information for long periods of time. Similarly, things that have been searched for and viewed via the Internet are typically stored for some period of time on devices which operate similarly to the Device. This information can often be recovered with forensic tools.

12. Based on my knowledge, training, and experience, examining data stored on a digital storage device such as the Device can uncover, among other things, evidence that reveals or suggests who possessed or used the computer or digital storage devices.

13. There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

   A. Based on my knowledge, training, and experience, I know that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a digital storage device or computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   B. Wholly apart from user-generated files, digital devices like the Device can contain electronic evidence of how it has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operations. Users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

   C. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

14. *Forensic evidence*.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information on the Device that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of the use, who used the Device, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   A. Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of other devices to it, and the dates and times the device was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.  This information can be recovered months or even years after they have been downloaded onto the storage medium, deleted, or viewed.

   B. Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   C. A person with appropriate familiarity with how devices such as a smartphone works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how the devices were used, the purpose of their use, who used them, and when.

   D. The process of identifying the exact electronically stored information on a smartphone or other digital device that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

   E. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

   F. Your Affiant knows that when an individual uses an electronic device to aid in the commission of a crime, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.  From my training

    and experience, I believe that an electronic device used to commit a crime of this type may contain: information concerning addresses and/or locations looked up for navigation purposes (i.e. the address of the White House), text messages and other electronic communications detailing the suspect's plans and/or intent, location information showing areas to which the device has travelled and records of telephone calls made and received by the device.

    G. Your Affiant also knows that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, (such as saving a .pdf image file as a .doc document file) or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

15. *Need to review evidence over time and to maintain entirety of evidence.* Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis. Your Affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops. In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole. Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original. In the past, your Affiant has reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations. Your affiant has learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B. In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation. As such, your Affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time. As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

16. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying and reviewing the contents of the Device consistent with the warrant. The warrant I am applying for would authorize a later examination and perhaps repeated review of the Device or information from a copy of the Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Device to human inspection in order to determine whether it is evidence described by the warrant.

## INVESTIGATION

17. On February 13, 2019, I reviewed an email from the USSS Los Angeles field office and learned the following. On February 13, 2019, Marcie Mavreles, a lead case manager at Cheyenne Regional Medical Center ("CRMC"), called the USSS Los Angeles field office and reported a patient at CRMC, Timothy Ryan Cessor ("Cessor"), had made threats to kill the President of the United States. Mavreles advised Cessor had been on a psychiatric hold since February 4, 2019. Mavreles reported Cessor had attempted to drive from Cheyenne to Washington D.C. with a firearm in his vehicle to "kill Trump and all members of Congress who support him."

18. I reviewed a Cheyenne Police Department report from February 4, 2019, by Officer Reemers, who interviewed Cessor and a member of the CRMC mental health evaluation unit ("the CRMC mental health professional") on February 4, 2019. The CRMC mental health professional had initiated an emergency detention on Cessor as a threat to himself and/or others. The CRMC mental health professional also interviewed Cessor and Cessor's father on February 4, 2019. The CRMC mental health professional provided information from these interviews to Officer Reemers.

19. In his report, Reemers summarized his interview with the CRMC mental health professional. As summarized in Reemers' report: "Timothy Cessor had been driving through Nebraska on the afternoon of Feb. 4th [2019]. About five hours into his trip, Cessor stopped to call his parents. He told them that he had a gun and was en route to Washington, DC to kill the president. Cessor's parents persuaded him to return to Cheyenne. Upon his return, his father . . . took and secured the gun and drove Timothy to CRMC. Timothy was admitted at about 1930 hours" (It is not clear from Officer Reemers' report whether this information originally came from Cessor, Cessor's father, or both).

20. In his report, Officer Reemers also summarized his interview with Cessor. As summarized in Reemers' report: "I learned that Cessor had been armed with a Smith & Wesson .40 Caliber pistol (model unknown) and two 13-rd magazines. The gun belonged to his father and he had taken it without his father's knowledge or permission. Cessor did not really have a coherent plan to kill the president. He had not considered the details or his chances of success. He had an urge to take immediate action. Cessor had not written any notes, letters or e-mails to explain or justify his actions. Cessor had no 'manifesto.' Cessor verbalized a list of grievances against President Trump."

21. On February 14, 2019, I reviewed emergency room notes by a CRMC emergency room doctor, which summarized information provided by "the patient and his family." According to the notes, Cessor presented with "anger homicidal ideation towards President Trump. Pt states, 'I went to kill Trump.' . . . His dad states the pt was driving on I-80 with the intent to cause harm, when the pt stopped in Nebraska and called him. He was able to convince the pt to come back for treatment. Pt states he does not want to harm anyone else 'unless they are helping him (Trump) or come to his aid.'"

22. On February 14, 2019, I interviewed Cessor's father by phone. Cessor's father provided the following information. Cessor called his father at about 2:00 pm on the afternoon of February 4, 2019. Cessor told his father that Cessor had left home armed with a gun and was going to take care of Trump. At the time of the conversation, Cessor told his father that Cessor was in Nebraska. Cessor said he could not do it and had called his father for help. Cessor's father persuaded Cessor to meet back at their house in Cheyenne, Wyoming. At the time Cessor's father received this call from Cessor, Cessor's father was working in Nebraska for the Air Force. Shortly after 5:00 pm, Cessor met his father and mother at their house in Wyoming and Cessor agreed to be driven to CRMC.

23. On February 14, 2019, I interviewed Timothy Cessor at the Cheyenne Regional Medical Center, Behavioral Health Unit. Among the statements made by Cessor are the following, in which he described his actions on February 4, 2019:

On 2/4/19, Cessor wrote Trump on the side of his truck and put a red X through it. He then stockpiled food and drinks in the truck and looked throughout his family's home for the keys to his father's gun safe, intending to take weapons from there. When he could not find the keys, he pried open a lockbox located under his parents' bed. Inside the lockbox, he found a .22 cal pistol and a .40 cal pistol. Cessor said he took the loaded .40 cal pistol and an extra 13 round magazine and got in his truck. He said he looked up the location of the White House on his mobile phone's GPS and began driving to Washington, DC with the intention of going to the White House to kill the President. Cessor said he did not have a plan to kill POTUS but intended to go to the White House and see if he could get in a position to shoot him.

Cessor also gave his mobile telephone number as 303-920-1874 and said his father, Jeff Cessor, had the phone since his admission to the hospital on February 4, 2019. Cessor stated his email address was tcessor@gmail.com. Timothy Cessor then signed a U.S. Secret Service form 1922 Consent to Search for his property at his parents' home located at 3545 Stampede Ranch Road, Cheyenne, Wyoming. Among the items authorized for seizure from the premises were cellular telephones and other electronic devices.

24. On February 14, 2019, I met with Jeff Cessor at the family home, 3545 Stampede Ranch Road, Cheyenne, Wyoming and showed him the signed consent to search form executed by his son, Timothy Cessor. Jeff Cessor admitted me to the home and showed me Timothy's room, which, with his permission and in accordance with the consent to search, I searched for evidence in connection with threats against the President and other USSS protectees. Not finding Timothy Cessor's mobile telephone, I asked Jeff Cessor for it. He then gave it to me. I asked Jeff Cessor for the pass code. He did not want to give it to me, but I watched him unlock the phone and remove the pass code from the device, unlocking it for any future examination.

## CONCLUSION

25. Based on the investigation described above, probable cause exists to believe that inside the Device (described on Attachment A), will be found evidence and instrumentalities of a violation of 18 U.S.C. 871(a) (described on Attachment B).

26. Affiant has probable cause to believe, that Cessor, was in possession of the Device, as described in Attachment A, when he was traveling to Washington D.C. on about February 4, 2019. Affiant has probable cause to believe that the Device is the phone that Cessor used to call his father on about February 4, 2019 when he stated that he was going to take care of Trump.

27. I have probable cause to believe that the Device, as described in Attachment A, will contain evidence of violations of violations of federal law, including 18 U.S.C. § 871(a). I have probable cause to believe that location data from the Device will indicate where Cessor traveled on about February 4, 2019. Location data from the Device will indicate where Cessor was located when he called his father and stated that he was going to take care of Trump. There is probable cause to believe that the Device will contain data about Cessor's call history, contacts, and text history. Such records may indicate who Timothy Cessor contacted on about February 4, 2019, when Cessor called his father and made the statement regarding the President of the United States, and who else Cessor made contact with on about that day. There is also probable cause to believe that internet history may be located in the Device. Such internet history may indicate what websites Cessor visited and what things he read about and/or researched in preparation for traveling to Washington D.C.

28. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items described in Attachment A for the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

*s/ Jerry W. Heyn, Jr.*_____
Jerry W. Heyn, Jr.
Senior Special Agent, U.S. Secret Service

SUBSCRIBED and SWORN before me this __19th__ day of __March__, 2019.

_____
THE HON. SCOTT T. VARHOLAK
UNITED STATES MAGISTRATE JUDGE

Application for search warrant was reviewed and is submitted by David Tonini, Assistant United States Attorney.

8